**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GREGORY RUTLEDGE and MICHAEL MEJIA | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 06 C 6214 |
| | ) | |
| COOK COUNTY, et al., | ) | Judge Joan H. Lefkow |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 59(a) MOTION FOR NEW TRIAL**

NOW COME the Defendants Gary Grayer, Brian Harris, Jermaine Lanier, Nicholas Paolino, William Scott, and Craig Johnson, by their attorney, ANITA ALVAREZ, State's Attorney of Cook County, and respond to Plaintiffs' Rule 59(a) Motion for New Trial. In support, the Defendants state the following:

**Jury's Verdict Was Not Against the Manifest Weight of the Evidence**

Plaintiffs, Michael Mejia ("Mejia") and Gregory Rutledge ("Rutledge"), are not entitled to a new trial because the jury's verdict was not against the manifest weight of the evidence. A new trial is warranted if the verdict is against the manifest weight of the evidence or if a prejudicial error occurred. *Bankcard America Inc. v. Universal Bancard Inc.*, 203 F.3d 477, 480 (7th Cir. 2000). Even if errors occurred, no new trial is required if the errors were harmless. *Romero v. Cincinnati Inc.*, 171 F.3d 1091, 1096 (7th Cir. 1999). New trials granted because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience. *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995) *quoting Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3rd Cir. 1991).

In determining whether to grant a new trial, a jury verdict must be accorded great deference.

*Foster v. Cont'l Can Corp.*, 783 F.2d 731, 735 (7th Cir. 1986). The issues of credibility and weight of the evidence are within the purview of the jury. *Carter v. Chicago Police Officers*, 165 F. 3d 1071, 1079 (7th Cir. 1998). Where the evidence for both sides is equal and the issue for the trier of fact is who to believe, the credibility of witnesses is peculiarly for the jury, and it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict. *Latino v. Kaizer*, 58 F.3d 310, 317 (7th Cir. 1995). In establishing manifest weight of the evidence, each Plaintiff must demonstrate that no rational jury could have rendered a verdict against him. *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006). In determining whether a Plaintiff has met this standard, this Court must view the evidence in the light most favorable to the Defendants, leaving issues of credibility and weight of the evidence to the jury, and must uphold the jury's verdict if it is supported by a reasonable basis in the record. *Lewis v. City of Chicago*, 563 F. Supp. 2d 905, 923 (N.D. Ill. 2008). In a case involving hotly disputed evidence, it is the province of the jury to decide whose account was more credible. *Id.* Plaintiffs' failed to satisfy their burden at trial and Plaintiffs failed to establish that no reasonable jury could have returned a verdict for the Defendants in their Rule 59(a) motion.

Mejia's testimony was not supported by the evidence. Mejia testified that on the day of the incident he weighed 146 pounds, and eleven officers beat, kicked, and stomped him during an initial beating. (Tr. 267: 6-16, 23-25; 268: 1-13; 255: 19-20). After this first beating, Mejia was pulled from the ground by his braid and pushed into "a different crowd of about twenty [officers];" however, Mejia does not know any of these officers. (Tr. 269: 16-21; Trial Ex. 53). After this second beating, someone put handcuffs on Mejia and more officers kicked him in his head and ribs. (Tr. 273: 19-21). Mejia, Elijah Santiago ("Santiago"), and Paul Barney ("Barney"), who testified on behalf of the Plaintiffs, testified that the duration of the beatings upon Mejia were between three and seven minutes, and he was beaten head to toe. (Tr. 272:1; 474: 3-7; 384: 25; 385: 1-2, 16-19; 296: 11). After this beating, Santiago never saw any cuts or bleeding from Mejia. (Tr. 498: 12-13). Mejia

stated that he was treated at Cermak immediately after the incident and that his care was limited; in fact, medical personnel "rubbed alcohol pad on my face, checked my ribs, and gave me a prescription for maybe Motrin or Ibuprofen." (Tr. 309: 23-25; 310: 1). Mejia did not testify to any other treatment at Cermak on October 9, 2005.

Mejia's testimony was contradicted by Dr. Yan Yu's testimony and the photographs. Dr. Yu testified that he examined and found, "ecchymosis (bruising) on the left forehead, but no swelling, no bleeding." (Tr. 506: 17-18). Dr. Yu found a superficial laceration on Mejia's left cheek and tenderness to the left rib. (Tr. 506: 19-22). Moreover, Dr. Yu never noted any injuries to the arms or legs of Mejia. (Tr. 516: 16-25; 517: 1-2). Dr. Yu never ordered an x-ray on Mejia or sent him to an off-site hospital. (Tr. 517: 3-10). Furthermore, pictures of Mejia were taken four days after this alleged incident. (Tr. 282: 18-25; 1-7). The photographs and the lack of injuries depicted do not support the vicious beating that Mejia alleged took place.

Mejia testified he suffered a massive beating, while defenseless, by over thirty different officers, who struck his face, body, arms, and legs by punching and kicking. However, Mejia never presented any evidence supporting an unfettered attack while suffering no corroborating injuries. The nature and extent of the Mejia's injuries were insufficient to find Mejia's testimony credible.

Rutledge's testimony was not supported by the evidence at trial. During the beating of Mejia, Rutledge turned to the scene of the beating and stated, "Why are you guys beating him like this?" (Tr. 182: 8-9). Officer Harris then punched Rutledge in the face. (Tr. 182: 12-13). Officer Grayer hit Rutledge and Rutledge fell to the floor. (Tr. 182: 13-14). Paolino, Scott, Grayer, Harris, Lanier, and other officers began beating on Rutledge on the floor, who was covering his face while lying in the fetal position. (Tr. 182: 12-23; 183: 21-23). When the beating ended, Rutledge was handcuffed, and Harris then kicked Rutledge in the face; Grayer also kicked Rutledge at that time. (Tr. 184: 1-8). Rutledge stated that the whole length of this beating took "about two minutes, I think a minute or

3

two." (Tr. 184: 16). According to Santiago, Rutledge was beaten for three to five minutes, and Barney said Rutledge was beaten for six minutes. (Tr. 400: 19-20; 474: 3-7). Rutledge testified that he saw himself in a mirror and his "eyes were all bloody. My mouth was bloody. My face was about -- it was all to here. Just my head was pounding. It was -- it was just hurting really bad. Then my chest was hurting. I had bruises and stuff all over, lacerations under my eyes and stuff." (Tr. 186: 8-12). Rutledge went to Cermak, spoke with a doctor, who gave some pain pills and sent Rutledge back to Division 11. (Tr. 187: 6-8).

Rutledge's testimony was contradicted by the physical observations of Dr. Yu and the photographs. Dr. Yu testified that he examined Rutledge and found bruising on the left forehead, on the right maxillary and temple area, and on the right neck. (Tr. 509: 22-24). Dr. Yu never noted any other injuries to Rutledge. (Tr. 520: 11-25; 521: 1-8). Dr. Yu further stated that no x-ray was taken of Rutledge on the night of October 9, 2005, and that x-rays would have been taken that night if the injuries were serious. (Tr. 521: 15-25). Moreover, photographs of Rutledge were presented at trial, which depicted Rutledge approximately a week and a half after the incident. (Tr. 193: 22-24). These photographs did not display any bruising to back, sides, legs, or forearm areas that Rutledge testified was most vulnerable to the punching and kicking of multiple officers.

As with Mejia, Rutledge's testimony was simply not supported by the physical evidence from Dr. Yu's observations and the photographs. Rutledge did not present any supporting medical testimony that would justify the tremendous void between a massive beating and the lack of injuries observed by Dr. Yu. Moreover, Rutledge testified to observations of his own massive injuries, while looking in a mirror, but shortly thereafter at Cermak, Dr. Yu did not observe any of these alleged injuries.

A reasonable jury could have refused to assess liability to the Defendants because Plaintiffs did not establish the identity of the Defendants and their involvement in this alleged beating. The

4

Plaintiffs and their witnesses contradicted the identity of the officer that initially struck Mejia. During a shakedown procedure on tier BJ on October 9, 2005, Rutledge and Mejia testified Officer Scott grabbed Mejia, without any provocation, and bang his head into a concrete wall between three to four times as Mejia was slow to put on his shoes. (Tr. 177: 2-25; 209: 7-16; 265: 3-6). Santiago stated that Scott shoved Mejia's head into the closet window one time. (Tr. 471: 4-9; 486: 24-25; 487: 1-5). However, Barney stated that Officer Lanier was the one that slammed Mejia's face into a door, a single time. (Tr. 335: 16-17; 377: 6-10). Moreover, Barney, who had prior confrontations with Scott, never testified that Scott was part of the beating at all. (Tr. 336: 19-22; 368: 5-25; 369: 1-10).

The Plaintiffs and their witnesses contradicted the identity of the second officer involved in striking Mejia. According to Plaintiffs, after Mejia was initially hit in the head, Officer Paolino was the next officer to hit Mejia by punching Mejia in the side. (Tr. 178: 22-24; 265: 17-18). However, Santiago stated that after Mejia's head was slammed into the window, Officer Scott punched Mejia in the ribs, not Paolino. (Tr. 487: 10-11). In fact, Santiago never testified to any involvement by Paolino, Harris, Grayer, Lanier, or Johnson. (Tr. 499:124-25; 500: 1-8).

The Plaintiffs presented inconsistencies as to the remaining officers. Barney stated that the only officers that he knew involved in the beating were Paolino and Lanier. (Tr. 336: 19-22). Barney stated that Harris and Grayer never kicked, beat, or punched Mejia while he was on the ground. (Tr. 387: 23-25; 387: 18-21). Moreover, Barney never testified that Scott was part of the beating at all. (Tr. 336: 19-22; 368: 5-25; 369: 1-10). Santiago saw fifteen to twenty officers respond to tier BJ, and stated that fifteen to twenty officers then beat Mejia. (Tr. 472: 3-5; 473: 6-10; 484: 20-23). Other than Scott, Santiago could not name any other officers. (Tr. 488: 2-7). Moreover, Santiago never testified that he had any knowledge of the other named officers, Harris, Paolino, Grayer, or Lanier, even being there, let alone the individual involvement in the incident of each officer. (Tr. 499: 19-25; 500: 1-8). Mejia stated that he was beaten by eleven officers; however, other than the five Defendant

5

officers, Rutledge does not testify to any other unnamed officers involved in beating Mejia. (Tr. 179: 9-10; 212: 4-6; 267: 6-16, 23-25; 268: 1-13). These material inconsistencies as to the identities of the officers appropriately resulted in findings for the Defendants.

Plaintiffs now argue that the Defendants' case was not credible. Paolino testified that he was swung at by Michael Mejia. (Tr. 427: 8-11). Paolino's testimony was consistent with the incident report filled out on October 9, 2005, where Mejia became combative and started swinging at Officers Scott and Paolino. (Tr. 444: 8-15). Scott testified to Mejia's refusal to orders, and punching at Paolino. (Tr. 738: 20-22; 739: 20-22). Harris and Grayer testified Mejia refused several orders, and shortly thereafter, Rutledge come off the wall swinging his fist. (Tr. 684:4-17; 537: 16-18; 538: 24-25; 539: 1-6; 542: 3-12). Lanier also saw Mejia being non-compliant, followed by Rutledge charging officers Paolino and Scott with a closed fist. (Tr. 652: 2-25; 653: 1-18).

Paolino and Scott testified consistently as to the actions of Mejia, whom the officers were most aware of since they were giving him instructions. Harris and Grayer testified consistently as to the actions of Rutledge, since these officers were closest to him when he charged officers. Johnson testified to Rutledge coming off of the wall as well, and any other inconsistency in Johnson's observations, are not material as he was not primarily involved in the use of force; but rather, he was a supervisor trying to secure a busy scene of fighting inmates and restoring security for other inmates and officers. In addition, at the time of the incident, the officers were responsible for continued supervision of the other inmates still outside of the cells, not including Plaintiffs, which further explains any inconsistency of the officers. (Tr. 669:11-22; 681: 20-25; 682: 1-2). Each Defendant's testimony is consistent as to material facts: the officers responded to tier BJ, conducted a strip search, Mejia refused orders and resisted being handcuffed, Mejia became confrontational and combative, Mejia was subdued to the concrete jail floor, Rutledge ran at officers, and Rutledge was taken down to the concrete floor of the jail. All of the consistencies and inconsistencies in the Defendants'

6

testimonies are strictly within the purview of the jury.

Plaintiffs also contend that Mejia couldn't have swung at an officer because of an illness; however, Plaintiffs never offered evidence supporting such an argument. Plaintiffs chose not to call witnesses that could explain the diagnosis, treatment, and prognosis of Mejia, and failure to do so could reasonably result in an inference of adverse evidence. Any import of this argument could have been mitigated by the fact that Mejia was housed and living in general population.

This case is analogous to *Latino*. In *Latino*, the Seventh Circuit held that in cases involving simple issues but highly disputed facts, greater deference should be afforded to the jury's verdict than in cases involving complex issues with facts not highly disputed. *Latino*, 58 F.3d at 314. In *Latino*, Defendant Chicago Police officers were sued for a constitutional violation stemming from false arrest. *Id.* at 311. The Plaintiffs testified that they were falsely arrested by Chicago Police officers for attempting to illegally sell Chicago Bulls tickets at Chicago Stadium. *Id.* at 312. Defendant officers and the Plaintiffs testified to "strikingly different" versions of the facts, and essentially presented the jury with a "swearing contest." *Id.* at 311-2. After the first trial, the jury found in favor of the Defendants, and Judge Shadur granted Plaintiffs' motion for new trial, where he stated that he believed the Defendants perjured themselves. *Id.* at 315. In reversing, the Seventh Circuit held that the judge in a jury trial does not act to evaluate and weigh the evidence, and the judge should not set the verdict aside as against the weight of the evidence merely because, if that judge acted as juror, he or she would have reached a different result. *Id.* The district judge can take away from the jury testimony that reasonable persons could not believe; however, that exception is a narrow one, and can be invoked only where the testimony contradicts indisputable physical facts or laws. *Id.* Even if a judge finds that facts are improbable, the judge can only grant a new trial where facts testified to are physically impossible. *Id.* The Seventh Circuit held that Judge Shadur abused his discretion and usurped the jury's role in granting a motion for new trial. *Id.* at 317.

7

Mejia and Rutledge's injuries could have reasonably resulted from resisting officers. After Mejia refused orders, Paolino stated that he attempted to restrain Mejia, at which time, Mejia became combative and started swinging at Officers Scott and Paolino. (Trial Tr. 444: 12-15). Officer Paolino and Officer Scott took Mejia to the ground. (Trial Tr. 444: 15-17). Rutledge was taken down to the concrete floor hard face first, with Grayer, who was 6'4" tall and weighed 270 pounds, landing on top of Rutledge. (Tr. 542: 4-13; 584: 20-22). At the time Rutledge was taken down, Grayer had his left arm secured and Rutledge was not able to break his fall. (Tr. 587:12-13). Moreover, Rutledge was resisting and struggling against the officers. (Tr. 542: 11-12; 684: 25; 685: 1-8; 690: 9-11; 703: 17-19). A reasonable jury could have concluded that the Plaintiffs' contact with being taken to the floor, struggling with officers on the concrete floor, or any other inadvertent contact caused the minor injuries that were observed by medical personnel, and therefore, the jury was free to determine *excessive* force was absent.

Plaintiffs argue that the causes of Plaintiffs' injuries are undisputed. Plaintiffs rely on Steve Martin's testimony; however, Defendants submit it is not proper for Plaintiffs to suggest uncontested expert testimony when the Plaintiffs' pretrial motion barred Defendants' expert. Steve Martin's testimony is both incredible and unqualified regarding the cause of injuries and the machination of such injuries because it is beyond the scope of his expertise pursuant to Rule 26(a)(2)(B). (Tr. 775: 3-7). Despite Steve Martin's lack of medical qualifications, he stated that inadvertent injuries can occur to inmates during use of force without the officer resulting in any injury. (Tr. 829: 12-21). Plaintiffs did not present any *medical* evidence supporting their claim of multiple strikes to the face and body. Plaintiffs offered the jury no explanation how Steve Martin found fifteen discreet injuries to Mejia or Rutledge, whereas Dr. Yu, the treating medical doctor, found only three areas of minor injuries to each Plaintiff. (Tr. 793: 20-23; 506: 17-22; 509: 22-24). Steve Martin never testified that the injuries were a "physical impossibility," and such testimony is beyond his expertise. As a result,

the jury determined the proper weight of Steve Martin's testimony. No medical personnel testified that, to a reasonable degree of scientific certainty, the only way Mejia or Rutledge suffered their injuries were by multiple punches and kicks by multiple officers for a prolonged period of time.

Plaintiffs rely on *Ruffin*, 125 F. Supp. 2d 105, 111 (S.D.N.Y. 2000), a non-binding decision from the trial court in the Southern District of New York. In *Ruffin*, the court granted a new trial after making its own credibility determination. The court was moved by deleted portions of videotaped evidence and undisputed medical testimony in an excessive force claim. *Id.* at 108. Plaintiff alleged he was kicked directly in the mouth twice and suffered broken teeth. *Id.* at 106-7. Plaintiff called an expert witness, an oral maxillofacial surgeon and forensic dentist, who said that the injuries were "caused by multiple trauma to two teeth, probably as a result of either punching or kicking." *Id.* at 108. *Ruffin* is reversible in our jurisdiction by the holding in *Latino*, since the trial judge usurped the role of the jury to weigh evidence, including expert testimony, and assess credibility of witnesses. Moreover, in our case, Plaintiffs did not offer undisputed medical testimony supporting Plaintiffs' allegations of a vicious beating. Also, in *Ruffin*, the Plaintiff suffered broken teeth from being kicked two times; however, in our case, neither Plaintiff suffered any injuries of this variety despite being beaten on a substantially greater scale.

### **Defendants did not commit any error throughout the trial**

Defendants did not violate any of this Court's pre-trial motions. Moreover, this Court's jury instructions properly instructed the jury on the law and evidence while curing any errors. Plaintiffs' argument that the motions *in limine* were violated by discussions of weapons housed in jail is extremely tenuous. Briefly, on limited occasions, discussions of weapons were relevant to inform the jury of the officers' conduct in conducting a strip search on October 9, 2005. In opening statement, Plaintiffs did not object to any now disputed content and afford the Court an opportunity to remedy any error. Steve Martin's knowledge of weapons, knives, and

shanks was relevant to articulate the necessity of strip searches in a correctional setting as a matter of security rather than an abuse of power. Moreover, this concession by the Plaintiffs' expert witness is relevant to prevent jury confusion attributing a constitutional violation arising from a strip search. However, this court limited the scope per Plaintiffs' objection, and any further conversation of weapons and the purpose of strip searches through this witness were sustained. (Tr. 839: 4-17). In fact, contrary to any alleged prejudice, Plaintiffs questioned Harris in direct examination regarding a strip search being conducted to find weapons and contraband as a matter of a security concern. (Tr. 680: 6-13). Defendants never attributed weapons to the Plaintiffs or inmate witnesses, and Plaintiffs have not established evidence of prejudice by testimony of weapon searches.

Defendants raised the motion *in limine* with respect to a lengthy incarceration and acquittal to prevent jury confusion and prevent any sympathy that might result from Rutledge's acquittal on his murder charge. Defense counsel asked brief questions of the time Rutledge was admitted to Cook County Jail by stating: "Q: Do you remember when you entered, you came into the jail? A: Yes. August of 2002." (Tr. 204: 16-17). "Q: 2002. So you were there approximately three years prior to? A: Yes." (Tr. 204:19-21). At that time, Mr. Kimrey objected based on relevance, and the Court sustained the objection. (Tr. 204: 22-24). Defense's questions were relevant as to the foundation for Rutledge's testimony regarding his "worker" status on the tier, knowledge of disciplinary procedures, and identities of the Defendants and other officers. (Tr. 201: 4-6, 22-25; 188: 2-25, 189: 1-20). Yet despite these innocuous questions, Plaintiffs objected. In fact the Court stated, upon hearing counsel on this issue in a sidebar, "It's not reversible. You objected and I sustained, right?;" in fact, the Court offered Plaintiffs' counsel an opportunity to address any perceived harm on redirect and at that time, counsel stated, "We're fine." (Tr.252: 3-14). Moreover, the length of incarceration was never raised again or argued during closing argument.

As to the Plaintiffs' motion on gang affiliation, Rutledge stated that he did not know that

10

Mejia had a nickname and that he always referred to him as Michael. (Tr. 248: 5-11). Rutledge further stated that he went by the name Greg or Gregory, and upon being asked by Defense "is that it?," Rutledge stated that "I got -- I have a nickname previously before, but—Q: What is it?" At that time, Plaintiff's counsel objected and this Court sustained the objection. (Tr. 248: 16-22). Throughout the remainder of the trial, including cross of Mejia, no other mention of nicknames was made or argued. Moreover, Mejia was asked, "Q: Are you from the same part of the neighborhood? Did you grow up together? Ms. Snyder: Objection. The Court: Overruled. A: No, we didn't grow up together." (Tr. 310: 24-25; 311: 4). This line of questioning goes to interest, bias, or motive, and Defense never asked or addressed this line of questioning to any other witness. Neither of these lines of questioning were repeated, argued, or offered as any direct or indirect evidence of gang affiliation or evidence of prior criminal conduct.

Defense did not improperly question Steve Martin during cross-examination regarding the Illinois State Board since these questions were solely for impeachment under Rule 26. Defense's questioning was relevant to training or certification of Steve Martin on use of force in Illinois, not regarding the training that the Defendants received. Where a party argues that a jury has been exposed to information not admitted into evidence in order to obtain a new trial, that party must show that it was prejudiced by the improper exposure. *Deicher v Evansville*, 545 F.3d 537 (7th Cir. 2008). Apparently, Plaintiffs argue that Defense counsel asking Martin about his qualifications and training in Illinois is violative of discovery and improper; however, Plaintiffs have not shown that any of this limited cross-examination on Martin's training was prejudicial or in violation of Rule 26. Moreover, Plaintiffs never raised an objection to these questions, and review is therefore waived.

Defendants did not commit error during closing arguments. In challenging a verdict for allegedly prejudicial closing arguments by opposing counsel, the plaintiffs carry a heavy burden. *Doe v. Johnson*, 1994 U.S. Dist. LEXIS 1262, at * 17 (N.D. Ill. Feb. 8, 1994). A

party's improper comments during closing arguments rarely rise to the level of reversible error. *Ramsey v. American Air Filer, Co., Inc.*, 772 F.2d 1303, 1311 (7th Cir. 1985). To warrant a new trial, "statements made during closing argument must be plainly unwarranted and clearly injurious to constitute reversible error." *Jones v. Lincoln Electric Co.*, 188 F.3d 709, 730 (7th Cir. 1999). Reversible error does not exist where the Court instructs a jury that closing arguments are not evidence, that the jury's verdict should be based on the evidence alone, and in the context of closing arguments, comments are not significant. *Thompson v. County of Cook*, 428 F. Supp. 2d 807, 811 (N.D. Ill. 2006).

In addition, the plaintiffs failed to object to the Defendants' allegedly improper closing argument. "After failing to timely object to opposing counsel's remarks, the plaintiffs may not claim error after the verdict has been returned." *Johnson*, 1994 U.S. Dist. LEXIS 1262, at * 18. An objection can be delayed until immediately after the close of arguments. *Joseph v. Brierton*, 739 F.2d 1244, 1249 (7th Cir. 1984). *See Walden v. Illinois C. G. Railroad*, 975 F.2d 361, 366 (7th Cir. 1992).

In *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-239 (1940), the Court held that counsel cannot as a rule remain silent, interpose no objections, and after a verdict has been returned, seize for the first time on the point that the comments to the jury were prejudicial. The Seventh Circuit has held in the past "to bind a party to its strategic decision to sit silent in the face of claimed error by refusing relief when the party complains because the result is unfavorable." *Deppe v. Trippe*, 863 F.2d 1356, 1363 (7th Cir. 1988). A party's silence at a time when an objection appears appropriate often may reflect that party's tactical posture, perhaps the party feared that a contemporaneous objection would incur hostility from the jury. *Id.* If a party fears that an objection during closing argument will incur the jury's wrath, he still must preserve his objections to any allegedly prejudicial comments, and a nearly

contemporaneous objection made at the bench at the close of an opponent's argument, clearly stating the grounds for the objection, would preserve the matter for appeal. *Id.* Such a procedure would also afford the trial court an opportunity to cure the claimed error through use of a jury instruction. *Id.* In the absence of objection and giving to the trial court an opportunity to attempt to ameliorate the situation by a curative instruction, we must assume that the jury had the ability to separate inflammatory and emotional rhetoric from the relevant facts in the case. *Gonzalez v. Volvo of America Corp.*, 752 F.2d 295, 298 (7th Cir. 1985).

This Court instructed counsel on both sides to exercise discretion and maintain decorum in making objections during closing argument. This Court never gave a blanket prohibition against objections during closing argument. This Court stated, "unless there is some earthshaking problem, don't object during the other side's argument. I'll let you make any objections on the record outside the presence of the jury to preserve any objections for appeal." (Tr. 891: 9-16). After the Court gave this instruction to the attorneys, Plaintiffs never objected, alleged prejudice, or ask for clarification. Also, after Defendants argument, counsel did raise a single objection, which was not raised in Plaintiffs' Rule 59(a) motion. Therefore, all objections to argument as raised in Plaintiff's Rule 59(a) motion are waived.

Moreover, this Court properly instructed the jury on admissible evidence and arguments. In the context of argument, no error was committed and all arguments were based on reasonable inferences of the evidence. As to Rutledge's photographs, it was reasonable to question their weight since they were taken approximately ten days after October 9, 2005. Moreover, some photographs of Rutledge showed a bruise under the left eye, which differed from the observations by Dr. Yu. Moreover, Plaintiffs had power of rebuttal, which allowed Plaintiffs to address comments on photographs; however, those arguments are limited to the evidence and Plaintiffs cannot testify to evidence for the first time in argument. *Walden*, 975 F.2d at 366.

Argument that this is not a case against Cook County was not improper. The argument was challenging the Plaintiffs' ability to establish their burden as to the identity of the officers being accused and any finding of liability, not damages. (Tr. 974: 1-20). In the context of argument, 'this is not a case against Cook County" referred to the Cook County Jail, which was responsive to Plaintiffs' argument of "This is how things work at Cook County Jail. You have to send a message to them." (Tr. 944: 3-4). Defense counsel did not address Cook County in the context of pecuniary damages or Defendants ability to pay. At the time Defense counsel stated this is not a case against Cook County, counsel continued to discuss the Plaintiffs' burden in the context of liability by also addressing the Sheriff's Office and finding liability based on accountability. Moreover, counsel stated that this is a case against these six defendants individually, and the Plaintiffs must prove that each of these officers is responsible for the specific actions as accused.

Plaintiffs' counsel enumerates a series of alleged improper arguments without citing any authority or evidence supporting the prejudicial nature of those arguments. The entire argument's context should be considered in determining error. (1) Comments of the incident in tier AD related to tier BJ where evidence existed of fighting and disorder on both tiers, in that Mejia fought with an officer. These facts are relevant when factoring the requirement to maintain and restore security with the elements of Mejia's claim, as indicated in Mejia's excessive force jury instruction. (2) Comments on the lack of x-rays regarding Mejia are from evidence that no x-rays were taken on October 9, 2005 by Dr. Yu. Defense counsel enumerated Dr. Yu's findings and then, in proper context, Defense counsel discussed how the lack of immediate medical care contradicted Mejia's credibility. (Tr. 956: 6-10; 16-22). (3) Defense counsel discussed all of the documented injuries and stated that there was a superficial laceration on the left face prior to commenting on the lack of more serious injuries and other

cuts on the body and face. Taken in context, this argument is relevant to the weight of the Plaintiffs' evidence. (Tr. 956: 6-10; 16-22).

(4) Defense counsel commented on beatings by 40 people based on the Plaintiffs' evidence that Mejia was beaten three times by officers, where the first group was 15-20 people, the second group of twenty officers, and an undisclosed number the third time; Rutledge was beaten by eight to ten officers. (Tr. 396: 4-6). (5) Plaintiffs' representation is not accurate; Defense said "they're cellmates," and Rutledge admitted that he was a cellmate with Mejia after the incident. (Tr. 975: 23; 203: 2-3). This argument goes to interest, bias, or motive as well as opportunity to fabricate. It is a reasonable inference from the evidence. (6) Defendants' argument against "sending a message" to the jail was invited comment. Plaintiffs' argument unfairly suggested the six individually named officers were responsible for Cook County Jail. Plaintiffs' argument is particularly improper since Plaintiffs never made a claim that would hold the Cook County Sheriff and his policies responsible under *Monell*. (7) Plaintiffs' characterization of Defense counsel's PowerPoint is inaccurate; the slide in question states "lack of injuries," and it is reasonable for the Defendants to refer to the lack of injuries in this case to determine credibility. (8) Plaintiffs' closing argument and rebuttal expressed the theme of beat down and cover-up, including "code of silence" as to Cook County Jail. Defense, in the context of addressing the themes of Plaintiffs' argument, argued for the jury *not* to consider fear, prejudice, or bias as Plaintiffs' argument may invoke that emotion. (Tr. 945: 1-6).

In fact, during argument, Defense counsel stated specifically that arguments of counsel are not evidence. (Tr. 967: 4). Moreover, if any argument was error, it did not constitute reversible error as each argument was not continuously repeated to the detriment of Plaintiffs.

## Conclusion

WHEREFORE, Defendants respectfully request this Court deny Plaintiffs' Rule 59(a) Motion.

Respectfully Submitted,

ANITA ALVAREZ
State's Attorney of Cook County

By: /s/James Pullos
Attorney for the Defendants

Patrick Smith
James Pullos
Kevin Frey
Assistant State's Attorney
Torts/Civil Rights Litigation
500 Richard J. Daley Center
Chicago, IL 60602
312-603-5105