UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **GREGORY RUTLEDGE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| vs. ) | Case No. 06 C 6214 |
| ) | |
| **COOK COUNTY, ILLINOIS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

This is a civil right case in which Gregory Rutledge, a pretrial detainee, and Michael Mejia, a prisoner, complained that five defendant officers at the Cook County Department of Corrections ("the Department") facility located at California Boulevard and 26th Street in Chicago violated their constitutional rights through the use of excessive force. On October 29, 2008, a jury returned a verdict in favor of all defendants on all claims. Plaintiffs made a timely motion for new trial. Rutledge has since settled with the defendants. Michael Mejia's motion for a new trial is the subject of this decision. For the reasons stated below, the motion for new trial [#261] will be denied.

**I.    LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 59(a), "[t]he court may, on motion, grant a new trial on all or some of the issues–and to any party– . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The district court is to consider whether the verdict is against the weight of the evidence,

1

the damages are excessive, or if for other reasons the trial was not fair to the moving party. *McNabola* v. *Chi. Transit Auth.*, 10 F.3d 501, 516 (7th Cir.1993) (citations omitted) (internal quotation marks omitted). The court may grant a new trial based on substantial errors in the admission or rejection of evidence. 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FED. PRACTICE AND PROCEDURE § 2805 (2d ed. 1995) (citing cases). In considering a motion for a new trial, the court is entitled to weigh the evidence for itself, *Thomas* v. *Stalter*, 20 F.3d 298, 304 (7th Cir. 1994) (citing 11 Charles Alan Wright & Arthur R. Miller, FED. PRACTICE AND PROCEDURE § 2806, at 44-45 (1st ed. 1973),[1] and to assess the witnesses' credibility. *Thomas*, 20 F.3d at 304 (citing *Whalen* v. *Roanoke County Bd. of Supervisors,* 769 F.2d 221, 226 (4th Cir.1985), *overruled on reh'g on other grounds*, 797 F.2d 170, 171 (4th Cir.1986) (per curiam) (en banc)). The court should not grant a new trial based on the weight of evidence unless "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Latino* v. *Kaiser*, 58 F.3d 310, 315 (7th Cir. 1995) (hereinafter "*Latino*"). This rule stems from the Seventh Amendment's limitations on the judge's power to reexamine the jury's verdict. *Id*. at 314. "The district judge can take away from the jury testimony that reasonable persons could not believe. However, that exception is a narrow one, and can be invoked only where the testimony contradicts indisputable physical facts or laws." *Id.* at 315 (citations omitted).

---

[1] The 1995 edition contains the same statement. *See* 11 Wright, Miller & Kane, FED. PRACTICE AND PROC. **§** 2805, at 67.

## II.     THE EVIDENCE

On October 9, 2005, Mejia was serving a sentence at Cook County Jail.  He was housed in a maximum security area, Division 11, Tier BJ.  At approximately 6:00 p.m. that evening, Mejia was in his cell, lying down, as he had been ill.  According to medical records in evidence he had been receiving medical care since August for a condition that was at least provisionally diagnosed as blastomycosis.  (Blastomycosis is "a rare infection that may develop when people breathe in (inhale) a fungus called *Blastomyces dermatitidis*, which is found in wood and soil."  MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/000102.htm#Definition).  The medical records indicated he was being treated with an antibiotic (Bactrim), a decongestant (Benadryl) and ibuprofin.  According to Mejia, he weighed 146 pounds, 20 pounds less than his weight in October 2008.  Other inmates were present in the day room or in their cells. For reasons that are not clear, a distress call was made–the officer identified as having made it denied doing so–indicating that an officer was "in trouble."  In fact, no officer was in trouble, nor was there any alarming disturbance in the area other than that the officer had observed Rutledge "popping" the lock of his cell to place his lunch tray on the floor outside.  Assuming an officer was in trouble, however, an unknown number of officers – probably 20 - 30 – went immediately to Tier BJ to assist.  All inmates were ordered out of their cells and directed to line up against a wall for a strip search.  The strip search proceeded without incident until the inmates were being instructed to put their clothes back on.  Here the versions of the facts diverge.

According to Mejia, the inmates were ordered to remove the insoles from their shoes if they "came out."  Mejia's insoles didn't come out (because he had not yet received standard

3

issue shoes) so he left his shoes sitting on the floor. Officer Paolino picked up Mejia's shoes, tore out the insoles and tossed them on the floor. The inmates were ordered to pick up their shoes and bang them together, put them on their feet, then face the wall. Because he was ill, Mejia was slow in performing the tasks. He was in the process of putting his second shoe on when defendant Scott ordered him to "turn the F around." Scott walked up to him, grabbed him by the back of the neck and slammed his head into the wall three times. Paolino then approached him from the right and punched him in the ribs. Scott pulled him back from the wall by the neck and turned him around. Mejia saw Scott, Paolino, Harris and Grayer and several other officers in front of him. Harris then hit Mejia in the face with his fist, followed by punches to the upper body from Lanier, Scott, Grayer, and Paolino, and other officers. Rutledge said Lanier, Paolino, Grayer and Harris all punched or kicked Mejia. One of them threw him to the ground, and officers Grayer, Scott, Paolino, Harris and Lanier and other officers then stomped and kicked him. Mejia attempted to cover his face and move from side to side dodging blows. An officer pulled him to his feet by his braid and pushed him toward another group of about twenty unknown officers who also stomped and kicked him. After this, he was handcuffed and again kicked in the head and ribs.

Other inmate witnesses testified consistently with Mejia's testimony insofar as they described Mejia's slowness to respond to instructions as the officers' provocation to attack him. One inmate witness, Paul Barney, who was standing nearby identified Officer Lanier, rather than Scott, as the officer who slammed Mejia's face into a door or wall. Rutledge and a witness Murchison, however, testified that it was Scott. Plaintiffs' witnesses Elijah Santiago and Barney testified that the beating of Mejia lasted three to seven minutes. Rutledge measured time from

4

the head banging on the wall until Sgt. Johnson told the officers to stop as 1 to 2 minutes. All of the inmate witnesses testified that Mejia did not swing at or hit an officer. Rutledge said Mejia merely talked back just before his head was banged on the wall by asking, "Is this necessary?"

After the altercation, Mejia was taken to the dispensary for medical care. The medical evidence shows that he suffered from multiple contusions, including on the left side of his forehead, and superficial lacerations on the left side of his face. The treating physician noted "blunt trauma" to Mejia's forehead, face, and left rib. Mejia was cleaned up, given Motrin, and taken back to Tier BJ, where he was placed in segregation for 6 days. Mejia thought his ribs had been broken. The physician treating his blastomycosis ordered x-rays. A report dated October 11, 2005 revealed no broken ribs.

The officers consistently testified that Mejia swung at Paolino and that no officer hit or kicked him, or slammed his head against a wall. The remainder of their testimony was divergent on many facts, including whether any force was applied to Mejia and whether Mejia was injured at all. Officer Paolino testified that during the strip search, he gave Mejia several orders to face the wall, which he ignored. Shortly thereafter, Mejia became combative and took a swing at Officers Paolino and Scott, at which time Officers Paolino and Scott took Mejia to the ground and handcuffed him. Officer Paolino does not recall whether Mejia landed a punch on him at any time, although Mejia did attempt to strike him with a closed fist.

Officer Scott testified that he was one of the first officers to respond to the call. He took a position by the stairs and the closet door, about 15-20 feet away from Mejia, who was by the wall but facing out toward the day room. He observed Officer Scott give Mejia several orders to turn around and face the wall, but Mejia refused. As Mejia continued to disobey orders from

5

Officer Scott, both Officers Scott and Paolino moved towards Mejia. Officer Paolino motioned to Mejia to turn around. Mejia then swung at Officer Paolino with a closed fist. Officer Scott, who by then was standing 7-8 feet away from Mejia, grabbed Mejia's arm and attempted to subdue him. Officers Scott and Paolino struggled to restrain Mejia, finally taking Mejia to the ground after approximately one minute. At no time did Officer Scott strike Mejia or push him forcibly to the ground. After restraining Mejia, Officer Scott picked Mejia off the ground and noticed cuts and blood on Mejia's face. Officers Scott and Paolino then escorted Mejia out of Tier BJ.

Officer Lanier testified that when he arrived at Tier BJ, most of the inmates were lined up against the wall, and responding officers were ushering those inmates still in their cells out to the wall. At some point, Officer Lanier heard either Officer Scott or Officer Paolino give Mejia several orders to face the wall. At the time, Officer Lanier was standing by the TV and the phones; 30 feet away from Mejia. Officer Lanier did not approach the source of the commotion, nor did he see any officers restrain or hit Mejia at any time.

Lt. Johnson testified that when he entered Tier BJ through the entrance, he saw Mejia handcuffed on the floor near the stairs and closet door. Mejia was subdued and did not appear to be a threat. Lt. Johnson walked in Mejia's direction, stopping for about 20 seconds by Mejia to ask an officer why Mejia was restrained. Lt. Johnson does not recall which officer he addressed or the officer's reply. According to Lt. Johnson, both Rutledge and Mejia were transported to the dispensary after being restrained because it was standard operating procedure, not because either inmate appeared injured.

Each of the officers was repeatedly impeached with prior inconsistent testimony about

the incident. For example, during his deposition, Officer Paolino claimed Mejia swung at him with both fists, but during his testimony Officer Paolino could not recall if this was true. During his deposition, Officer Paolino acknowledged that it was "possible" Mejia swung at him up to four times, but during his testimony Officer Paolino denied this possibility. In his use of force report, Officer Paolino did not mention that Mejia swung at him up to four times and possibly landed a punch. Finally, Officer Paolino claimed to have submitted a disciplinary report regarding the incident with Mejia, but the defense has been unable to locate such a report.

Because two officers did file a use of force report consistent with Department regulations, testimony that no force was used must be rejected.

### III. ANALYSIS

Mejia asserts three grounds for a new trial: (1) the verdict was against the weight of the evidence; (2) defense counsel repeatedly violated orders regarding the exclusion of evidence that taken together prejudiced Mejia; and (3) defense counsel's references to excluded evidence and improper statements in closing confused the jury and altered its verdict. The relevant facts are summarized below. To the extent they are not mentioned, the court has reviewed the submissions of the parties and determined that those facts or issues would not change the result of this decision.

    A. The Weight of the Evidence

Mejia argues that the officers' testimony, which was inconsistent among the officer witnesses and inconsistent with each defendant's prior statements regarding the incident, was so incredible that, as in *Ruffin* v. *Fuller*, 125 F. Supp. 2d 105 (S.D.N.Y. 2000), permitting the verdict to stand would be a miscarriage of justice. Mejia also contends that the defendants'

7

accounts of what happened are inconsistent with Mejia's injuries, evidenced by the Department's own medical records created immediately after the events. Mejia argues that the force used against him was excessive even if the jury believed that Mejia failed to comply with a verbal order or swung at Paolino because it is by definition excessive force for an officer to kick an inmate who is handcuffed on the ground or strike an inmate's head under any circumstances.

Citing *Latino*, defendants respond that the court may not substitute its view of the evidence for that of the jury. Defendants contend that the officers' testimony was sufficiently consistent, considering that the events took place three years before the trial; that the witnesses for the plaintiffs were also at times inconsistent and exaggerated the officers' actions and Mejia's injuries; and that the jury could have reasonably believed that Mejia's injuries could have resulted from Officers Scott's and Paolino's taking him to the ground.

In light of the size and weight of Mejia in contrast to the two officers, defendants' explanation is barely plausible, in that two very large men together taking a small man to the ground, as demonstrated in the courtroom, would not entail blunt trauma to the forehead, face and left rib or result in superficial cuts or multiple contusions on the face and ribs. In other words, it is a stretch to conclude that the defendants' testimony is consistent with indisputable medical evidence.

B. Improper Opening Statement

Mejia objects to a number of comments of counsel during his opening statement that, he believes, implied that the plaintiffs were dangerous men because they were in a maximum security tier, even though the court had authorized the defense merely to state the security level

8

of the tier where the incident occurred.² During the first moments of his opening statement, defense counsel told the jury that working for the Department is "a very dangerous job that has many hazards." He added, "The Cook County Jail is a very dangerous place." "You will see that if a detainee acts out and disobeys the rules, other inmates will follow [and] you may have a riot on your hands." He then asserted that the incident of Mejia's (actually Rutledge's, Tr. at 151) popping his cell door created a "very dangerous situation because . . . if an inmate is allowed to leave the cell, he can hide contraband, he can hide weapons, or even worse, he can harm another inmate or staff." Tr. at 149

The evidence, however, was scant of door-popping being the event that led to the call for assistance. The officer on duty, Edwards, testified that she observed Rutledge's conduct but did not call for assistance because of it, while two officers said she made the call. The other officers did not know the precise reason they were summoned to Tier BJ. The evidence was consistent from both sides that inmates popped their cell doors frequently. There was no evidence that any inmate was suspected of or discovered having weapons or contraband. Defendants justify their actions by stating they were merely articulating the necessity of strip searches in a correctional setting.

Because the court had instructed counsel not to go beyond stating that Tier BJ was a maximum security facility, the comments about the dangers of such a place at least violated the spirit of that order, particularly where the evidence that would be forthcoming revealed a fairly

---

² The court had overruled plaintiffs' objection to identifying the facility as a maximum security facility on condition that the evidence was merely descriptive, such as the "Department of Corrections definition of maximum security facility that could be used by your witness to explain where they were. So I would permit that." Tr. at 24.

9

calm day in the day room where the altercation took place.

    C.   Violations of Rulings on Admissibility of Evidence

Plaintiffs' *motion in limine* to exclude any reference to or evidence of the plaintiffs' alleged gang membership or affiliation was granted.  The court addressed the defendants' argument that the plaintiffs' common gang membership was probative of their credibility.  Weighing the probative value against the potential for unfair prejudice, however, the court barred the evidence.  Despite the ruling, defense counsel attempted to elicit other names Rutledge used for Mejia.  "Q. . . . Out of curiosity, did you refer to him as — in another name or by something else back on October 9, 2005."  A. No, Michael.  Q. That was — you always referred to him as Michael?  A. Uh-huh.  Q. Okay.  What about yourself?  A. I don't understand that question.  Q. Do you go by a different name?  A. Gregory, Greg.  Q. Is that it?  A. I got — I have [*sic*] a nickname previously before, but – Q. What is it?  Mr. Kimrey. Objection, relevance."  Tr. at 248.  Defendants do not deny that the effort was to elicit gang names, contend that the evidence was relevant, or explain why, if they thought it was relevant *and important*, they did not seek permission to elicit the evidence. They merely respond that after the court sustained the objection, they refrained from repeating the violation.

In another instance, after a ruling *in limine* barring evidence of the nature of the plaintiffs' conduct that landed them in jail, the length of their incarceration, or the fact that Rutledge had been acquitted and released, defense counsel on cross-examination of Rutledge asked how long he had been incarcerated, leaving the implication that he still was.  Defendants justify their conduct by stating it was relevant to Rutledge's status as a worker on the tier.  In any event, the court sustained the objection, and they didn't do it again, so defendants argue no harm

10

done.

During the jury instruction conference, the court rejected defendants' proposed Seventh Circuit Civil Jury Instruction 7.01.[3] This was consistent with the court's earlier ruling against plaintiffs' wishes that Cook County would not be identified to the jury as a defendant. The court rejected the instruction because "the only reason it would be there is to . . . raise an inference that there is not indemnity." Tr. at 889. Yet, defense counsel during closing argument stated, "This is not a suit against Cook County." Tr. at 974. Defendants respond that counsel made the statement to counter plaintiffs' counsel's plea in closing argument that the jury send a message to "them," after saying "This is how things work at Cook County Jail." Defendants argue this was appropriate in light of plaintiffs' burden to prove the case against each individual officer, not Cook County Jail or the officers as a group.

Mejia is correct that defendants' counsel's conduct stepped over the line in several instances. To argue that one violation of an order excluding evidence is permissible, so long as it was not repeated, is unworthy of the State's Attorney's Office, as is an attempt to get before the jury an excluded fact such as gang membership or the length of a plaintiff's incarceration by indirection and insinuation. Once having obtained the favorable ruling *in limine* that the jury would not know that Cook County was in the case, it was improper for counsel to falsely state that Cook County is not a defendant. Counsel have a duty to argue all grounds of relevance during the hearing on the *motions in limine*. Once the court has ruled, counsel are not free to decide for themselves that, in context, the evidence is actually admissible.

---

[3] Instruction 7.01, adapted for this case, states, "Defendants are being sued as individuals. The County of Cook is not a party to this law suit."

## IV. CONCLUSION

The issue is whether these facts taken together sufficiently prejudiced the jurors' view of Mejia that the verdict shocks the conscience and must be overturned. The court, having reviewed the arguments of counsel and the supporting transcript portions, concludes that they do not. First, let it be clear that this court agrees with Mejia that the verdict is inconsistent with the weight of the evidence, that plaintiffs' witnesses were more credible than the officers as to what occurred, and the plaintiffs' witnesses' testimony, although to some extent exaggerated, was more consistent with the evidence as a whole. The weight of the evidence is that the defendants used excessive force on Mejia.

At the same time, because the court should not set aside the jury's verdict unless the testimony is such that reasonable persons could not believe it, because it contradicts indisputable physical facts or laws, the court is not persuaded that a new trial is called for. If the jury believed that Mejia swung at the officers, and if they believed that the officers handled him roughly in taking him down, and if they believed the injuries were in fact minor, they could have inferred that the force was not excessive.

This is not like the situation in *Hillard* v. *Hargraves*, 197 F.R.D. 358 (N.D. Ill. 2000), where the prisoner plaintiff represented himself at trial. Mejia was well represented by skilled counsel who ably and thoroughly presented their clients' evidence of excessive force. There are parallels to *Ruffin* in that there the court granted a new trial where the defendant officer's version of the incident as a fall was inconsistent with expert testimony demonstrating the injuries were inconsistent with a fall and, instead, consistent with multiple kicks in the mouth. The court also rejected the credibility of the officer witnesses, noted that critical portions of the surveillance

tape of the inmate's cell had been destroyed, and the court was convinced that the verdict was "seriously erroneous." The district judge in *Ruffin*, however, was not under the constraint of cases such as *Latino*. Finally, the conduct of defense counsel that Mejia cites is not to be praised, but the court is not persuaded that it so negatively infected the proceeding that a new trial is warranted.

**ORDER**

The motion for new trial is denied.


Date: September 30, 2009          ENTER:_____
                                  JOAN H. LEFKOW
                                  United States District Judge